JOHN L. TRAVIS and JERRY W. CARTER, EUGENE S. MATTHEWS and W. B. DOUGLASS, as and Constituting the STATE RAILROAD COMMISSION, v. E. M. FRY.

190 So. 793

Division B

Opinion Filed July 28, 1939

*Theo T. Turnbull* and *Wm. P. Simmons, Jr.,* for Appellants;

*Wallace F. Sturgis* and *D. R. Smith,* for Appellee.

BROWN, J.—Appellee has been charged by appellants with operating a motor truck for transportation of property for compensation without authority from the Railroad Commission, as required by the Motor Transportation Act, Chapter 14764, Laws of Florida, Acts of 1931 (Sections 1335 [1], *et seq.,* Comp. Gen. Laws 1937, Perm. Supp.). At the time of the arrest appellee was hauling a power transformer belonging to the Florida Power Corporation from a substation near Brooksville, Florida, to the repair shop of the Power Corporation in Ocala, Florida, in a truck owned by him. Appellee had never applied for or received any authority from the Railroad Commission to haul goods of another for compensation.

On June 11, 1937, appellee filed his bill of complaint seeking an injunction to restrain the Commission and its inspector from further arrests or interference with his hauling. The theory of the bill is that since the major part of the contract compensation received for doing the work was for knowledge, experience, skill and work in handling, removing, installing, loading and unloading the transformers, the actual hauling of the transformer was a mere incident to the main work; therefore the hauling was not for compensation and appellee was not engaged in the business of transporting persons or property for hire as

contemplated by the provisions of the Motor Transportation Act.

On the same day a restraining order was entered by the circuit judge. Motions to dismiss the bill and dissolve the restraining order were filed by appellants and denied by the lower court's order of June 30, 1937. An answer was then filed denying the material allegations of the bill and the cause was set for final hearing. Appellee produced two witnesses, himself and W. L. Pillsbury, the employee of Florida Power Corporation who negotiated the contracts under which the transformers were hauled. The defense produced no witnesses. Upon conclusion of the testimony the circuit judge announced that the injunction would be made permanent. In his decree the learned circuit judge had this to say:

"The court finds that the operation upon which plaintiff was engaged at the time of his arrest for an alleged violation of Chapter 14764, Laws of Florida, Acts of 1931, was not an operation in violation of the provisions of said Act, and that the transportation at said time by the said E. M. Fry of a power transformer belonging to Florida Power Corporation, a Florida corporation, was incident to the main work upon which plaintiff was then engaged under a contract with said Florida Power Corporation; that the plaintiff is under and abiding a reasonable apprehension of future arrests based upon similar circumstances; that the transportation by plaintiff of power transformers of Florida Power Corporation, as an incident to contracts of the character referred to forms a negligible part of the consideration received by plaintiff for such engagements; that plaintiff is not engaged in the business of transporting persons or property for hire as contemplated by the provisions of said Act."

Sec. 1335 (2) Comp. Gen. Laws 1927, Perm. Supp. (Sec. 2, Chapter 14764, Laws of Florida, Acts 1931) provides:

"No auto transportation company shall operate any motor vehicle for the transportation of persons or property for compensation on any public highway in this State without first having obtained from the Railroad Commission a certificate of public convenience and necessity or a permit as hereinafter provided."

Section 1335 (1) (h), Comp. Gen. Laws 1927, Perm. Supp., reads as follows:

"The term 'auto transportation company' when used in this Article means every corporation or person, their lessees, trustees or receivers, owning, controlling, operating or managing any motor-propelled vehicle not usually operated on or over fixed rails, used *in the business* of transporting persons or property for. compensation over any public highway in this State and shall specifically mean and include: * * *." (Italics supplied.)

"3. Every person or corporation owning, leasing, using or exercising dominion over motor vehicles operated in the transportation of persons or property over public highways for hire, as defined in Section 1280, Compiled General Laws of 1927."

Section 1280, Compiled General Laws 1927, defines "For Hire" as follows:

"'For hire' as defined in this Chapter shall include all motor driven vehicles, or trailers hauled by a motor vehicle, in use for transporting persons, commodities or materials for compensation, or such motor vehicles as may be let or rented to another for a consideration: Provided, that motor vehicles temporarily used by farmers for the transportation of agricultural or horticultural products from farms or groves to

packing houses or to points of shipment by transportation companies shall not be held to be operated for hire: Provided, further, that motor vehicles used for transporting school children to and from school under contract with school officials shall not be deemed to be in use for hire."

The evidence shows that appellee has been exclusively engaged for five years in performing sundry contractual work for Florida Power Corporation, but has never operated under any contract of continuous employment, a separate agreement being made for each job. At infrequent intervals from 1935 to 1937 appellee contracted with the company to perform the work of locating on and removing from their base at the substations of the company power transformers weighing from 11,000 to 18,000 pounds, incident to which work it was necessary to carry over the public highways the removed transformers to another substation or to the repair shops of the company.

A crew of from seven to ten men was required to move the transformers; special equipment was necessary; and the fence around the substation often had to be taken down to remove them. In many instances a considerable space of time elapsed after the crew was on the ground before the transformer could be moved. This was due to the fact that an opportune time had to be selected to cut off the power, so that commercial enterprises and municipalities would not be inconvenienced by its interruption.

Appellee testified that "part of the money" he received was for hauling the transformers, but that "the bulk of the money" was for the preliminary work incident to hooking the transformer and loading it on his truck.

W. L. Pillsbury, the employee of the Florida Power Corporation, testified that appellee was not an employee of the company, but worked under contract only. He stated

that when a contract was made with appellee to haul a transformer he considered the money paid for the hauling as a "more or less minor part of the consideration that is paid." He could not state exactly what percentage was for the other work, but more than 50 per cent was for the other work. However, he testified that the hauling was an essential element of the contract.

This Court in Riley v. Lawson, 106 Fla. 521, 143 So. 619, stated that the Legislature by the Motor Transportation Act intended, *inter alia,* "to conserve and protect the State's highway system against unreasonable abuse and destruction on the part of those using the highway in private business for private gain, and to keep the highway system reasonably safe for public use," as well as "to exact compensatory taxes from those using public highways for private profit based on the actual mileage involved, the tax being dedicated to construction, maintenance and upkeep of the State's. highway system." It was held in that case that the State's right to regulate motor vehicle operators using the public highways for compensation exists independent of the nature of the business done.

The Act clearly states that no auto transportation company shall operate any motor vehicle for the transportation of property for compensation on the public highways without first having obtained the necessary certificate or permit from the Railroad Commission. Section 1335 (2), Comp. Gen. Laws 1927, Perm. Supp. A person operating a motor vehicle "used in the business of transporting persons or property for compensation over any public highway in this State" is included in the terms "auto transportation company" (Sec. 1335 [1] [h], Comp. Gen. Laws 1927, Perm. Supp.; Sec. 1280, Comp. Gen. Laws 1927), and provides that this term shall include (paragraph 3) "every person or

corporation * * * using * * * motor vehicles operated in the transportation of persons or property over public highways for hire, as defined in Section 1280" (which section is above quoted). The appellee contends, and we think correctly, that he was not *"in the business* of transporting property for compensation," strictly speaking; he further contends that that was merely incidental to his contract of installing the transformer. That may in a certain sense, be true, but it appears that he falls within the broad classification of transporting property "for hire" as defined in Section 1280, above quoted, such transportation of the heavy transformers being an essential part of his contract, and for which he was compensated by the power company, though no particular part of the contract price was allocated to such transportation. The section referred to does not provide that the use of a motor vehicle in transportation "for hire" must be the *principal* work done by the transporter for the owner of the goods hauled. Nor does it matter, under the Act, whether the compensation received for the actual hauling is greater or less than that received for the other work. See New Way Lumber Co. v. Smith, 128 Tex. 173, 96 S. W. (2d) 282.

The instant case is distinguishable from Big Bend Auto Freight v. Ogers, 128 Wash. 521, 269 Pac. 802, in that the Washington statute involved applied only to common carriers. The Florida statute is much broader and includes private contract carriers and "for hire" carriers, who haul for compensation.

This case does not show a "continuous or recurring carriage" under the same contract, each contract being separate and distinct. Hence appellee was not a "private contract carrier" as that term is defined in Section 1, subparagraph (i) of said Chapter 14764. He could only come within the classification of a "for hire" carrier. In spite

of the fact that this hauling of the transformers was a part only of his main contract, it was such an important and essential part thereof that we have reached the conclusion, on the facts of this particular case that appellee fell within the classification of a "for hire" carrier, and could therefore be required to secure a permit from the Commission and be made subject to the milege tax and other requirements applying to "for hire" carriers. In so doing we do not mean to so broaden the construction of the Act as to make it lead to absurd or oppressive results, or so as to make it apply to every person who uses a motor vehicle in connection with some particular business matter. Thus in the very able brief filed in behalf of appellee, it is suggested that to uphold appellants' contention in this case would mean that the statute would apply to several illustrated situations, one being this: "X phones Y, a typewriter repair man, and asks, 'what will you charge to come get my typewriter, clean it and return it?' Y answers. '7.50.' X agrees. Y gets in his truck, picks up the typewriter, hauls it to his shop, repairs and, returns it in his truck to X." In such a case, we agree with appellee that no part of the compensation necessarily includes the expense of using *the truck* for hauling the typewriter. Y could have called and gotten the typewriter with a wheelbarrow, or by carrying it in his hands so far as X was concerned. But here we are dealing with a different situation. While the question is not free from difficulty, we think that on the facts of this case, our conclusion is well founded.

We must look to the plain terms of the Act, and give it its ordinary meaning—not go out of our way to attain a construction that might benefit one individual, but would confuse the orderly application and administration when applied to other situations.

The decree of the lower court is reversed.

Reversed.

WHITFIELD, P. J., and CHAPMAN, J., concur.

TERRELL, C. J., concurs in opinion and judgment.

Justices BUFORD and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.