CITY OF BAYARD, NEBRASKA, A MUNICIPAL CORPORATION, APPELLEE, V. NORTH CENTRAL GAS COMPANY, A CORPORATION, APPELLANT.

83 N. W. 2d 861

Filed June 14, 1957. No. 34191.

Wright, Simmons & Harris, for appellant.

Kenneth F. Williams and Perry, Perry & Nuernberger, for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ., and WHITE, District Judge.

CHAPPELL, J.

Plaintiff, City of Bayard, same being a city of the second class, filed a complaint with the Nebraska State Railway Commission, hereinafter called the commission, alleging that defendant, North Central Gas Company, a Wyoming corporation, was an intrastate common carrier of natural gas, subject to regulation of its rates, services, and general control by the commission. Plaintiff sought an order directed to defendant, requiring it to show cause why it should not be so determined by the commission and be required to serve plaintiff with and sell it natural gas at wholesale rates fixed by the commission in the event plaintiff city, by eminent domain or otherwise, acquired title to defendant's natural gas distribution system located within plaintiff city and its environs.

Such a show cause order was duly issued and served, whereupon defendant filed an answer denying that it was a common carrier and denying that the commission had any jurisdiction over or authority to regulate and control defendant's rates and services. After admitting certain allegations in plaintiff's complaint, which need no repetition here, defendant alleged that it owns and maintains pipe lines for the transportation of its own natural gas to supply its own distribution systems for

the sale of natural gas at retail to ultimate consumers; that defendant is not now and never has been a common carrier of natural gas or other petroleum products; that it is not now and never has been engaged in the sale of natural gas or other petroleum products at wholesale for resale by others; and that an order of the commission requiring defendant to sell natural gas to plaintiff city at wholesale in event it acquires defendant's local natural gas distribution system therein would deprive defendant of its property for public use without just compensation and without due process of law, contrary to the Constitution of the State of Nebraska and the Constitution of the United States.

After a hearing by the commission, it entered an order finding that plaintiff's complaint should be sustained; that the commission had jurisdiction of the parties and subject matter with authority to prescribe rates, regulate sevices, and exercise general control over defendant as a common carrier, and ordered: "* * * that in event complainant acquires, by lawful means, title to the gas distribution system of defendant, now owned and operated in said city, that said defendant shall provide sufficient supplies of natural gas to said city, at rates which shall hereinafter be established by the Commission, after full and complete hearing, whereat the parties of interest may appear and present evidence." Thereafter, defendant's motion for rehearing was overruled, and it appealed to this court, assigning that the commission erred: (1) In entering an order upon a state of facts which had not yet arisen but which were contingent and uncertain; (2) in finding that it had jurisdiction of the subject matter of plaintiff's complaint, and had jurisdiction and authority to prescribe rates, regulate services, and exercise general control over defendant; and (3) in rendering the order aforesaid. We sustain assignments Nos. 2 and 3, which requires no discussion of assignment No. 1.

As stated in In re Application of Richling, 154 Neb.

108, 47 N. W. 2d 413: "The powers of the railway commission are derived from the Constitution. It is provided in part in Article IV, section 20, Constitution of Nebraska: 'The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision.' In the absence of implementing legislation the powers of the railway commission under this section are plenary in character and self-executing. But when the Legislature acts within the scope of the constitutional provision, the railway commission is subjected to the provisions of such legislation. Rodgers v. Nebraska State Railway Commission, 134 Neb. 832, 279 N. W. 800."

In State ex rel. State Railway Commission v. Ramsey, 151 Neb. 333, 37 N. W. 2d 502, we held that: "The State Railway Commission is authorized by the Constitution to regulate rates and service and to have general control of common carriers, within the state, as the Legislature may provide by law, and in the absence of specific legislation its powers and duties are unqualified.

"The powers and duties of the State Railway Commission are derived from and an independent part of the Constitution, and are administrative, legislative, and judicial.

"The authority of the State Railway Commission to regulate and control common carriers as the Legislature may provide by law, means in the manner in which the Legislature provides by specific legislation."

In Furstenberg v. Omaha & C. B. St. Ry. Co., 132 Neb. 562, 272 N. W. 756, we held: "Courts should review or interfere with administrative and legislative action of the railway commission only so far as is necessary to keep it within its jurisdiction and protect legal and constitutional rights.

"On an appeal to the supreme court from an order of the railway commission administrative or legislative in nature, the only questions to be determined are whether the railway commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made." See, also, Chicago, B. & Q. R. R. Co. v. Herman Bros., Inc., *ante* p. 247, 82 N. W. 2d 395; Hooper Telephone Co. v. Nebraska Telephone Co., 96 Neb. 245, 147 N. W. 674.

In the light of such rules and authorities hereinafter cited, we have examined the record. The material and relevant evidence, which is not disputed, is summarized as follows: Plaintiff's mayor testified as a witness for plaintiff that the question of acquiring defendant's local gas distribution system by eminent domain had been submitted to the electors of plaintiff city and carried; and that thereafter a certificate of the result was submitted to this court and a three-judge condemnation court was organized at Bridgeport. He testified that at the present time defendant supplies natural gas at retail to users thereof in plaintiff city; that no other natural gas company was furnishing natural gas in plaintiff city; that the nearest other natural gas pipe line was that of the Kansas-Nebraska Natural Gas Company located 9 miles east of plaintiff city; and that upon inquiry that company advised that it would not be interested in supplying plaintiff with natural gas. A consulting engineer testified as a witness for plaintiff, but his testimony dealt almost entirely with rates, which, as we view it, is unimportant here.

Defendant's secretary since 1946 testified as a witness for defendant that he was entirely familiar with defendant's operations since that time. The first time defendant was able to purchase intrastate gas from Nebraska fields for sale to ultimate consumers in plaintiff city was in 1951. Prior thereto defendant served such ultimate consumers with interstate gas purchased by defendant from Sand Drew Field in Wyoming, but

since 1951 defendant has acquired natural gas intrastate out of Huntsman Field in Nebraska with which it has served plaintiff city and its inhabitants. Defendant's pipe lines run from Sidney up to Northport, east to Lewellen, from Northport to Mitchell, and coming the other way from Glenrock, Wyoming, down to the state line. Defendant carries only gas purchased by it and sold only at retail by delivery to ultimate consumers through its own distribution systems. Defendant so serves Sidney, Dalton, and Gurley in the north part, then east to Broadwater, Northport, Lisco, Oshkosh, and Lewellen, then west to Bayard, Minatare, Scottsbluff, Gering, Mitchell, Morrill, and Henry. Defendant owns the distribution system in each of those cities and towns, and all gas transported by defendant is supplied to ultimate users at retail through those distribution systems. Defendant has never sold gas at wholesale or to others for resale, and its directors have never authorized the sale of gas at wholesale. Defendant's articles provide that it will conduct a "natural gas business." Defendant does not sell gas at wholesale in any cities or towns in any state. It now has a sufficient supply of gas from Nebraska to supply all inhabitants in all of the cities and towns that it now serves in Nebraska. There possibly could be interstate gas to serve some of those cities from time to time, but by and large all of the supply comes from Nebraska fields. Although unimportant here, he testified that the Wyoming Public Service Commission regulates defendant's retail rates, but has never fixed any wholesale rates, and the Federal Power Commission does not regulate defendant although its pipe line starts at Glenrock, Wyoming, and follows down the Platte River into Nebraska near Henry, which territory is supplied with gas at retail from Wyoming. No other municipality served by defendant has ever condemned its property for the purpose of making it municipally owned.

Defendant's manager for 26 years of that part of its

system from Douglas, Wyoming, to Lewellen, Nebraska, testified as a witness for defendant. He testified that gas from Huntsman Field, being routed from Huntsman to Northport and west, has supplied plaintiff city since 1951. Defendant's pipe line from Huntsman Field to plaintiff city is about 47 miles long. Gas from that field supplies gas intrastate for all the east end of defendant's own distribution systems, from Scottsbluff east, including Sidney, Gurley, Dalton, Minatare, Bridgeport, Northport, Broadwater, Lisco, Oshkosh, Scottsbluff, and Lewellen, but Mitchell and towns west are supplied interstate from Wyoming. In that connection, however, defendant has a junction station whereby it can if necessary supply the east end with Wyoming gas and the west end with Nebraska gas. In addition to users in the foregoing cities and towns, defendant sells gas at retail to some alfalfa mills and industrial plants, but otherwise defendant has never sold gas to anyone or any town or city either in Wyoming or Nebraska except at retail through its own distribution systems. He testified that to serve customers, a gas distributor must have reserves and potential customers in order to acquire it, and normally, as far as he knows, there is only one gas supplier for each city or town because the nature of the business is such that it operates better and more efficiently if the business has a monopoly in a local area.

Defendant's 25-year franchise in plaintiff city expired in March, and the governing body of the city did not want to renew it. In that connection, section 17-125, R. R. S. 1943, provides in part that: "* * * such city may, after such period, make any reasonable regulation with reference to any person, firm or corporation holding such franchise either as to charges for such gas or electricity or otherwise." Such section was construed in Kansas-Nebraska Natural Gas Co. v. City of St. Edward, 234 F. 2d 436, and City of University Place

v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N. W. 432.

Although defendant's franchise has expired, it has continued to distribute and sell gas at retail in plaintiff city, and there is no evidence that defendant has refused to continue to do so. Such witness testified that defendant's franchise with cities and villages served by it regulates the retail rate by agreement and approval by the city council. Defendant builds its own line to the source of supply, carries its own gas therein, and then distributes and sells it to ultimate consumers as a matter of contract between defendant and the city. Defendant has never at any time sold at wholesale and does not want to get into the wholesale business as plaintiff city desires it to do.

By stipulation, exhibit No. 3, a private reciprocal standby service contract entered into between defendant and Kansas-Nebraska Natural Gas Company, Inc., was received in evidence. As disclosed thereby, its primary purpose was to provide for the establishment of an interconnection between their pipe line systems in the vicinity of the Huntsman plant, which would enable either party to deliver gas to the other if required in order to meet an emergency situation on the other party's pipe line system. Also in that connection, the Kansas-Nebraska Natural Gas Company purchases natural gas from the oil field near Sidney, and has a gas distribution system in Alliance. That company has a pipe line from near Sidney north to Alliance, which passes through Northport and parallels defendant's line from Northport to Huntsman Field near Sidney. Their contract provides for operation of both lines from near Sidney to Northport by defendant. The Kansas-Nebraska Natural Gas Company puts its gas into its line near Sidney and withdraws at Northport the same volume of gas as required by it to provide gas service north of Northport. Defendant operates both such lines, although one is owned by Kansas-Nebraska Natural Gas

Company and defendant is paid for such operation 1½ cents per 1,000 cubic feet of natural gas carried in the line for Kansas-Nebraska Natural Gas Company.

Contrary to plaintiff's contention, such single contract would not make defendant a common carrier of natural gas and require it to carry such gas for any one applying for such service. It does not bring defendant within the definition of a common carrier as hereinafter defined. It does not constitute a holding of itself out to the public as engaged in the business of transporting gas from place to place for a consideration or hire, nor offer itself to the public generally as such. In that connection, defendant was simply a private carrier as defined in 13 C. J. S., Carriers, § 4, p. 31, wherein it is said, citing authorities: "A private carrier is one who undertakes by special agreement in a particular instance to transport property without being bound to serve every person who may apply. A private carrier of goods has been defined as one who, without being engaged in the business of carrying as a public employment, undertakes to deliver goods in a particular case for hire or reward; but this definition is not strictly correct in so far as it implies that one who does not carry for hire or reward is not a private carrier; and more accurately stated, a private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes, by special agreement in a particular instance only, to transport property from one place to another either gratuitously or for hire."

We turn then to certain statutes and other applicable authorities to ultimately determine whether or not plaintiff was a common carrier with its rates and services subject to general regulation and control by the commission. In doing so, we conclude that it was not.

Section 75-201, R. R. S. 1943, provides: "The State Railway Commission shall have the power to regulate the rates and services of, and to exercise a general con-

trol over, all railroads, express companies, car companies, sleeping car companies, freight and freight-line companies, and all other common carriers engaged in the transportation of freight or passengers within this state."

Section 75-301, R. R. S. 1943, provides in part: "The term 'common carriers' as used in said sections (75-101 to 75-512) shall be taken to include all corporations, companies, individuals and associations of individuals, * * * that may now or hereafter own, operate, manage or control any railroad, interurban or street railway line, * * * or part thereof, or any express company, car company, sleeping car company, freight and freight line company, telegraph and telephone companies, and any other carrier engaged in the transmission of messages or transportation of passengers or freight *for hire.*" (Italics supplied.)

Section 75-601, R. R. S. 1943, provides: "Any company, corporation or association, formed or created for the purpose of transporting, transmitting or conveying crude oil, petroleum, or the products thereof, or gases, from one point in the State of Nebraska to another point in the State of Nebraska *for a consideration,* are hereby declared to be common carriers. Any such company, corporation or association desiring or requiring a right-of-way or rights-of-way for the laying and maintaining of any pipe line or lines for such purpose within the State of Nebraska, and being unable to agree with the owner or lessee of any land, lot, real estate or right-of-way on the amount of compensation for the use and occupancy of so much of any lot, land, real estate or right-of-way as may reasonably be necessary for the laying, relaying and maintenance of any such pipe line, shall have the right to acquire the same for such purpose, as hereinafter provided. *Such company, corporation or association* is hereby placed under the control and subject to regulation by the State Railway Commission, and subject to Chapter 75, so far as the provisions thereof are applicable to pipe lines *as common carriers.*"

(Italics supplied.) Such section was amended, effective May 21, 1951, but only for the purpose of providing procedure for exercising the power of eminent domain as provided in sections 76-704 to 76-724, R. S. Supp., 1951. In that connection, it will be noted that the italicized words, "Such company, corporation or association" appearing in the last sentence of the section, refer back to those "formed or created for the purpose of transporting, transmitting or conveying * * * gases, from one point in the State of Nebraska to another point in the State of Nebraska *for a consideration,* * * *." (Italics supplied.)

Plaintiff's contention that defendant was a common carrier because it had exercised the right of eminent domain under section 75-601, R. R. S. 1943, has no merit for two reasons. First, defendant does not render the service of transporting gas for a consideration. Second, as shown by exhibit A, attached to and made a part of plaintiff's complaint, defendant in 1950 exercised the right of eminent domain as an interstate pipe line, as distinguished from an intrastate pipe line, under the provisions of section 75-609, R. R. S. 1943, in the manner provided therein, which it concededly had a right to do.

Section 75-609, R. R. S. 1943, provides: "Any company, corporation or association formed or created for the purpose of transporting or conveying crude oil, petroleum or other products thereof in *interstate commerce* through or across the State of Nebraska, and desiring or requiring a right-of-way, and being unable to agree with the owner or lessee of any land, lot or right-of-way for the amount of compensation for the use and occupancy of so much of any lot, land, real estate or right-of-way as may be reasonably necessary for the laying, relaying and maintenance of any such pipe line, shall have the right to acquire the same for such purpose in the manner provided in sections 75-601 to 75-607 as to companies formed or created for transporting or conveying crude oil, petroleum or the products there-

of within the State of Nebraska." (Italics supplied.) Such section was amended effective May 21, 1951, by adding thereto, "or intrastate within the State of Nebraska," after the word "Nebraska," and providing procedure for the exercise of eminent domain under sections 76-704 to 76-724, R. S. Supp., 1951. Such section in neither event contained any provision that such interstate pipe line companies were common carriers and thereby "placed under the control and subject to regulation by the State Railway Commission * * * as common carriers." Assuming herein, for purpose of argument, that defendant would be a common carrier if it held itself out to the public generally as engaged in transporting, transmitting, or conveying of gases "for a consideration," or "for hire," defendant did not do so and would not be a common carrier then or now. Defendant simply supplies and sells its own gas to ultimate consumers at retail. It renders no transportation services for hire.

In that connection, this court and other authorities have specifically defined a common carrier. In State ex rel. Winnett v. Union Stock Yards Co., 81 Neb. 67, 115 N. W. 627, this court concluded that any person, corporation, or association holding itself out to the public as offering its services to all persons similarly situated and performing as its public vocation the services of transporting passengers, freight, messages, or commodities for a consideration or hire, is a common carrier in the particular spheres of such employment. In the opinion it is said: "The statute, we think, has reference to all companies or persons who hold themselves out to the public as engaged in those things which characterize it as a common carrier. It has been said that a common carrier is one who holds itself 'out as ready "to carry at reasonable rates such commodities as are in his line of business for all persons who offer them, as early as his means will allow." ' Faucher v. Wilson, 68 N. H. 338, 39 L. R. A. 431, and cases cited."

In State v. Southern Elkhorn Telephone Co., 106 Neb. 342, 183 N. W. 562, this court said: "In order that a company be a common carrier, it is essential, in view of this statutory definition, as well as by the generally recognized meaning of the term 'common carrier,' that the service rendered by it must be a service that is rendered for hire. It was said by Justice Story in Citizens Bank v. Nantucket Steamboat Co., 5 Fed. Cas. (No. 2730) 719, 725: 'I take it to be exceedingly clear that no person is a common carrier in the sense of the law, who is not a carrier for hire; that is, who does not receive, or is not entitled to receive, any recompense for his services. The known definition of a common carrier, in all our books, fully establishes this result.' If no compensation is received, 'he is not in the sense of the law a common carrier; but he is a mere mandatory, or gratuitous bailee; and of course his rights, duties and liabilities are of a very different nature and character from those of a common carrier.'

"As pointed out in 10 C. J. 41, sec. 10: 'The law applicable to common carriers is peculiarly rigorous, and it ought not to be extended to persons who have neither expressly assumed that character nor by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it.'" Thereafter, quoting with approval from State ex rel. Buffum Telephone Co. v. Public Service Commission, 272 Mo. 627, 199 S. W. 962, L. R. A. 1918C 820, it is said: "'Operation for hire is a prerequisite to supervision by the commission. The reason is plain.'"

As stated in 9 Am. Jur., Carriers, § 4, p. 430, citing numerous authorities: "Subject to the qualifications and elaborations hereinafter noted, a common carrier may be defined, very generally, as one who holds himself out to the public as engaged in the business of transporting persons or property from place to place, for compensation, offering his services to the public generally." Also, as said in § 9, p. 435: "No person is

a common carrier who does not carry for hire; that is, who does not receive, or is not entitled to receive, any compensation for his services." Further, as said in § 15, p. 437, citing numerous authorities: "It is well established that the state cannot, consistent with constitutional guaranties against infringement upon private property rights, by legislative fiat or edict or by the orders of an administrative commission, arbitrarily impose the character or status of a common carrier upon a mere private carrier or other person who has not devoted his property to such a public use."

In the light of the evidence and foregoing rules of law, we conclude that defendant is not a common carrier for hire or a consideration, and is not subject to regulation and control by the commission as a common carrier. Thus, we conclude that the state railway commission had no jurisdiction or authority to render the order involved herein. We find no constitutional or statutory provisions which would authorize us to hold otherwise. Authorities cited by plaintiff are distinguishable upon the facts or constitutional and statutory provisions.

Other issues were raised and discussed in briefs of counsel, but in view of our conclusion that defendant is not a common carrier subject to regulation of its rates and services or under the general control of the commission, we do not deem it necessary to discuss them.

For reasons heretofore stated, we conclude that the order of the Nebraska State Railway Commission should be and hereby is reversed and the cause is dismissed. All costs are taxed to plaintiff.

REVERSED AND DISMISSED.